No. 00-812

## IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2002 MT 35

BURHAN MALLAK,

Plaintiff and Appellant,

v.

STATE OF MONTANA,

Defendant and Respondent.

APPEAL FROM: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable Diane G. Barz, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Jay F. Lansing, Moses Law Firm, Billings, Montana

For Respondent:

Mike McGrath, Montana Attorney General, Jennifer Anders, Assistant Montana Attorney General;
Dennis Paxinos, Yellowstone County Attorney, Mark A. English, Deputy Yellowstone County Attorney,
Billings, Montana

Submitted on Briefs: January 10, 2002

Decided: February 27, 2002
Filed:

_____

Clerk
Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Burhan Mallak (Mallak) appeals from the Thirteenth Judicial District Court's denial of his petition for postconviction relief. We reverse and remand.

¶2 The following issue is presented:

¶3 Did the District Court err in denying Mallak's Petition for Postconviction Relief?

FACTUAL AND PROCEDURAL BACKGROUND

¶4 In 1982, Mallak left Iraq and entered the United States under refugee status. He now lives in Billings, Montana. On September 14, 1988, the Yellowstone County Attorney filed an Affidavit and Motion for Leave to File Information alleging Mallak sold cocaine and LSD to an undercover detective. Mallak pled not guilty, and defense counsel was appointed. In the omnibus hearing form, Mallak indicated that he would rely on a defense of insanity, and he claimed incompetency. He stated that the general nature of his defense was diminished mental responsibility, entrapment and a general denial. Mallak also moved for a psychiatric examination to evaluate his mental capabilities and determine whether he was brain damaged and/or susceptible to being easily taken advantage of in view of his intellectual ability. In addition, when Mallak later moved for a continuance of his trial, he notified the District Court that his ability to speak English was marginal.

¶5 Approximately two months later, Dr. Steven C. Wagner evaluated Mallak. In Dr. Wagner's report, he concluded that Mallak had an IQ of 65 and was mildly mentally retarded. Dr. Wagner could not determine whether Mallak's mental retardation stemmed from a head injury he suffered at the age of six. Regarding Mallak's English vocabulary skill, Dr. Wagner found that Mallak functioned at approximately the level of a four-year-old child. At this level, Mallak could only understand very simple one step instructions. Dr. Wagner also concluded that due to Mallak's borderline intellectual abilities, he could be very easily led. Altogether, Dr. Wagner diagnosed Mallak with adjustment disorder, borderline personality disorder and mild mental retardation.

¶6 Following receipt of Dr. Wagner's report, Mallak filed his Notice of Defenses. He once again indicated that he would rely on the defenses of psychological defects and entrapment. With respect to the entrapment charge, Mallak believed that he was acting as an undercover agent for law enforcement when he sold drugs to an undercover detective.

¶7 On August 15, 1989, Mallak signed an Acknowledgment of Waiver of Rights in which he agreed to plead guilty to both felony counts of criminal sale of dangerous drugs. There was no plea agreement, no charges were dismissed or reduced, and the Yellowstone County Attorney did not offer a sentencing recommendation in exchange for Mallak's guilty plea. In Mallak's affidavit in support of his petition for postconviction relief (Affidavit), Mallak stated that he met with his attorney only a couple of times, and that his brother had to accompany him because of his limited understanding of English. Mallak also stated that he did not understand the Waiver form, but his attorney told him to plead guilty and "things would go easy" for him. He claimed the handwritten portion of the Waiver form setting forth the facts of his offense was not completed in his handwriting. Mallak does not recall his attorney mentioning that he could be deported if he pled guilty.

¶8 On August 24, 1989, Mallak entered a plea of guilty to both felony counts. Unfortunately, the record of these proceedings was destroyed. In his Affidavit, Mallak states that he does not recall the presence of an interpreter during these court proceedings. Furthermore, Mallak does not recall the District Court judge or anyone else informing him that he could be deported if he pled guilty. He states that he would not have pled guilty had he been so informed.

¶9 On September 28, 1989, Mallak was sentenced to five years imprisonment at the Montana State Prison with all five years suspended. He completed his sentence on September 28, 1994.

¶10 In 1999, Mallak applied to become a United States citizen. When the United States Immigration and Naturalization Service discovered Mallak's 1989 drug conviction, it began deportation proceedings. On March 9, 2000, Mallak resisted deportation by filing an Application for Asylum alleging that he would be killed if he returned to Iraq due to his previous political affiliations and that he would be separated from his wife and children who are United States citizens.

¶11 Shortly after filing his Application for Asylum, Mallak also filed a Petition for Postconviction Relief. Without holding an evidentiary hearing, the District Court denied the Petition. Mallak appeals the District Court's denial and requests remand for an evidentiary hearing.

STANDARD OF REVIEW

¶12 We review the denial of a petition for postconviction relief to determine whether the trial court's findings of fact are clearly erroneous and whether its conclusions of law are correct. Discretionary rulings in postconviction relief proceedings, including rulings relating to whether to hold an evidentiary hearing, are reviewed for abuse of discretion. State v. Hanson, 1999 MT 226, ¶ 9, 296 Mont. 82, ¶ 9, 988 P.2d 299, ¶ 9 (citation omitted).

DISCUSSION

¶13 Did the District Court err in denying Mallak's Petition for Postconviction Relief?

¶14 The District Court reviewed Mallak's petition captioned "Verified Petition for Postconviction Relief," as both a postconviction relief request and, in the alternative, a motion to withdraw a guilty plea. The court concluded that both were time-barred. As to the postconviction petition, the District Court relied upon the five-year statute of limitations in § 46-21-102, MCA (1987), and held that the statute was not tolled and had expired before Mallak filed his petition. Construing Mallak's postconviction petition as a motion to withdraw his guilty plea, Judge Barz relied on State v. Osterloth, 2000 MT 129, ¶ 24, 299 Mont. 517, ¶ 24, 1 P.3d 946, ¶ 24, and State v. Reynolds (1992), 253 Mont. 386, 391, 833 P.2d 153, 156, and concluded that it, too, was untimely, having been filed more than one year after Mallak entered into the plea agreement.

¶15 The only relief sought in Mallak's petition was the District Court's permission to withdraw his guilty plea; therefore, despite its caption, it will be viewed as such. This Court has held on numerous occasions that the substance of a document controls, not its caption. See Miller v. Herbert (1995), 272 Mont. 132, 136, 900 P.2d 273, 275; Moody v. Northland Royalty Co. (1997), 286 Mont. 89, 95, 951 P.2d 18, 22; Carr v. Bett, 1998 MT 266, ¶ 52, 291 Mont. 326, ¶ 52, 970 P.2d 1017, ¶ 52 (Nelson, J. concurring). Because the petition was a request to withdraw a guilty plea, the five-year statute of limitations in § 46-21-102, MCA (1987), relied upon by the District Court, is inapplicable. Rather, the applicable statutory provision is § 46-16-105, MCA (1987), which states "[a]t any time before or after judgment the court may, for good cause shown, permit the plea of guilty to be withdrawn and a plea of not guilty substituted."

¶16 The District Court cited State v. Osterloth and State v. Reynolds as authority for denying Mallak's motion to withdraw a guilty plea because it was filed more than one year after his plea was entered. However, neither of these cases establish so categorical a rule. In fact, there is no case in Montana that establishes any bright-line rule on the timeliness of a plea withdrawal motion. We have not established a rule or standard under which a trial court must address a request to withdraw a guilty plea; rather each case must be considered in light of its unique record. State v. Enoch (1994), 269 Mont. 8, 11, 887 P.2d

175, 177.

¶17 This Court has, however, established three factors to be taken into consideration when determining whether "good cause" under § 46-16-105, MCA (1987), exists to permit the withdrawal of a guilty plea:

a. the adequacy of the district court's interrogation as to the defendant's understanding of his plea;

b. the promptness of the motion to withdraw the prior plea; and

c. the fact that the defendant's plea was apparently the result of a plea bargain in which the guilty plea was given in exchange for dismissal of another charge.

State v. Koepplin (1984), 213 Mont. 55, 59-60, 689 P.2d 921, 923; State v. Bowley (1997), 282 Mont. 298, 304, 938 P.2d 592, 595; State v. Knox, 2001 MT 232, ¶ 11, 307 Mont. 1, ¶ 11, 36 P.3d 383, ¶ 11. Each of these three prongs will be discussed as they apply to the case at bar.

¶18 The adequacy of the district court's interrogation of a defendant at the time of a plea establishes whether a defendant's plea is voluntary, knowing and intelligent. When a defendant does not understand the charges against him, the elements of the crime with which he is charged, or the consequences of the crime, he cannot enter into a guilty plea, waiving numerous constitutional rights, knowingly, intelligently or voluntarily. Knox, ¶ 17 (citing State v. Radi (1991), 250 Mont. 155, 159, 818 P.2d 1203, 1206). In this case, however, there is no record of the District Court's interrogation at the time Mallak entered his plea because the record has been destroyed. Absent such a record, our only recourse is to consider Mallak's petition and the State's response to his factual allegations concerning the circumstances surrounding Mallak's change of plea.

¶19 It is apparently undisputed that Mallak had an English language comprehension level of a four-year old, an IQ of 65, and no interpreter during the proceedings. Under these circumstances, it is improbable that he understood what was occurring at his change of plea hearing. Moreover, the extent of his deficits makes it doubtful that he understood the proceedings well enough to intelligently waive his constitutional rights. (See ¶ 27 herein.)

¶20 Mallak had consistently professed that he was working with and for the police and knowingly delivered drugs to a police officer he had seen in uniform a few days earlier, because that was what he was supposed to do as an undercover agent. It is also significant that Mallak entered into a plea without the benefit of a plea agreement, thereby giving the State a plea of guilty to the original charges without receiving any benefit in return. He signed a form, written by someone else, describing his offense. His lawyer encouraged him to plead guilty, telling him that "things would go easy for him." Furthermore, it is also undisputed that Mallak was never told of a crucial and life-altering consequence of his plea and an element of his punishment--the likelihood of deportation.

¶21 For Mallak, deportation is a far harsher sentence than he agreed to accept. If deported, Mallak will be permanently separated from his family and forced to leave the United States after living here for 20 years. Moreover, Mallak continues to express his belief that if he is deported, he will be killed. He adamantly, and understandably, claims that had he known a consequence of his guilty plea and an element of his punishment was the risk of deportation, he would never have pled guilty. Of course, we recognize that, as in Henderson v. Morgan (discussed below), (1976), 426 U.S. 637, 96 S.Ct. 2253, 49 L. Ed.2d 108, Mallak's present claim that he would not have pleaded guilty had he known of the risk of deportation is impossible to prove in retrospect.

¶22 In Henderson, the U.S. Supreme Court held that Morgan's plea to second-degree murder was involuntary for two reasons: 1) his lower than average intelligence (Morgan's IQ ranged from 68 - 72);

and 2) the fact that he was never told at the time of his plea that intent was an element of the crime of second-degree murder. As did Mallak, Morgan explained to the court that his lawyers had advised him to plead guilty and he followed their advice, but would not have done so had he known that "intent" to kill his victim was required for a finding of second degree murder. He professed that he had no such intent. The Supreme Court conceded that had Morgan's attorneys informed him of the intent requirement at the time of his plea, there was no way to know what Morgan's plea would have been at the time. "Indeed, we assume that he probably would have pleaded guilty anyway. Such an assumption is, however, an insufficient predicate for a conviction of second-degree murder." Henderson, 426 U.S. at 644, 96 S.Ct. at 2257, 49 L.Ed.2d at 114.[1]

[1]Morgan had entered into his plea agreement in 1965, and filed a motion to withdraw his plea in 1970, which was denied. He then filed a writ to habeas corpus in 1973 and the Federal District Court denied relief. The Court of Appeals reversed and directed the district court to conduct an evidentiary hearing , at the conclusion of which the district court held that Morgan's guilty plea was involuntary and had to be set aside. The Court of Appeals and the U.S. Supreme Court affirmed. Henderson, 426 U.S. at 638-41, 96 S.Ct. at 2254-55, 49 L.Ed.2d at 111-12.

¶23 Henderson is apposite to the case at bar for obvious reasons. As was Morgan's, Mallak's level of intelligence is considerably lower than average (and even more so when combined with his serious language limitation). More to the point, Mallak was deprived of a far more critical piece of information on which to make an intelligent and knowing choice, than was Morgan--the likelihood of deportation.

¶24 In State v. Cavanaugh (1983), 207 Mont. 237, 673 P.2d 482, we reversed the district court's denial of a postconviction petition filed more than five years after Cavanaugh entered his plea of guilty, concluding that his plea was not made knowingly and voluntarily. Cavanaugh argued that failure to inform him of the possibility that he may be denied parole constituted a failure to inform him of a consequence of his plea, and, therefore, the sentencing court should never have accepted his plea and he must be permitted to withdraw it. We agreed and remanded for further proceedings. Cavanaugh, 207 Mont. at 240, 673 P.2d at 484. Here, the ramifications of the undisclosed consequence are far greater.

¶25 This Court recognizes that it was not until 1991 that the Montana Legislature enacted a law that required foreign defendants be told during plea proceedings that a plea of guilty could result in deportation, § 46-12-210(1)(f), MCA. In February 1991, Bozeman attorney, Paul Frantz, who staunchly supported this bill in written testimony, explained its purpose as follows:

This procedural safeguard is needed because cases may arise in which non-citizens enter pleas for offenses completely unaware that they may be deported, be excluded from admission to the United States, or be denied naturalization as a result of their plea. . . . Deportation, exclusion from admission to the United States, or denial of naturalization are all such harsh results potentially stemming from entry of a guilty plea that non-citizens should be made aware that certain immigration consequences may result. While there exist several consequences that result from entry of a guilty plea, no consequence is as harsh as permanent exclusion from the United States. This legislation is necessary to guarantee constitutional protection for those non-citizens appearing in our Montana courts. It would promote fundamental fairness and justice . . . .

House Bill 439, Senate Judiciary Committee Hearing, March 5, 1991. Appropriate to the bill's significance, it passed unanimously.

¶26 This bill makes it clear that deportation is a life-altering consequence of entering a guilty plea. Because Mallak had no knowledge of this prospect, and given the facts set forth above and the absence of a record of his change of plea, serious doubts about the voluntariness of Mallak's plea are raised. In situations of doubt, our well-established case law holds, "[d]oubts that suggest a plea is involuntary should be resolved in favor of the defendant." See Knox, ¶ 10, State v. Schaff, 1998 MT 104, ¶ 17, 288 Mont. 421, ¶ 17, 958 P.2d 682, ¶ 17; Enoch, 269 Mont. at 18, 887 P.2d at 181; State v. Melone, 2000 MT 118, ¶ 14, 299 Mont. 442, ¶ 14, 2 P.3d 233, ¶ 14. Here, these doubts should be resolved in favor of Mallak.

¶27 The second prong of the "good cause" test is the promptness with which the defendant acts to withdraw a guilty plea. As pointed out by the District Court and the State, there are several cases stating the "general rule" that requests to withdraw a guilty plea filed more than one year after entry of the plea are viewed as untimely. However, as we note above, this is not a firm rule and each case must be considered in light of the specific facts associated with the case. In this case, the full consequences of Mallak's guilty plea did not surface until 1999 when he applied for U.S. citizenship and learned for the first time that he could be denied citizenship and deported. Mallak acted promptly thereafter to resolve this matter.

¶28 As for the third prong of the "good cause" test, it is undisputed that Mallak entered into his plea agreement without the benefit of a plea bargain, and did not receive any benefit in exchange for his plea of guilty. Thus, Mallak's petition satisfies all three prongs of the "good cause" test set forth above. Enoch, 269 Mont. at 12, 887 P.2d at 177.

¶29 We emphasize once again that the circumstances of this case, including Mallak's documented mental incapacity and unfamiliarity with the English language at the time of his change of plea, and the absence of a record of the change of plea proceedings, are extraordinary. Our decision here is predicated upon these distinctive and exceptional circumstances conjoined with the dramatic and devastating consequences of deportation. Given this unique combination of factors, we conclude the District Court abused its discretion in denying Mallak's petition for leave to withdraw his guilty plea.

¶30 Accordingly, we reverse and remand to allow Mallak to withdraw his guilty plea.


/S/ PATRICIA COTTER


We Concur:

/S/ JIM RICE
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ JIM REGNIER
Chief Justice Karla M. Gray, dissenting.


¶31 I respectfully dissent from the Court's opinion. I would affirm the District Court on

the issues raised by Mallak on appeal. Those issues are 1) whether Mallak was entitled to an evidentiary hearing on his petition for postconviction relief; 2) whether that petition was timely under the "fundamental and clear miscarriage of justice" exception to the usual statutes of limitations relating to postconviction relief petitions, as set forth in State v. Redcrow, 1999 MT 95, 294 Mont. 252, 980 P.2d 622; and 3) whether the five-year statute of limitations for postconviction relief petitions was tolled by § 27-2-401, MCA.

¶32 Instead, in its well-intentioned effort to do the "right" thing for Mallak, the Court has fashioned an entirely new case on appeal, raised issues not raised by Mallak and decided those issues without benefit of briefing by either party.

[I]t is our obligation to decide the cases filed in this Court on the basis of the issues and arguments raised by the parties. In my view the best decisions result where both sides have had the opportunity to vigorously argue and challenge the positions and authorities of the other side. While the temptation is often great to decide a case on the basis of the argument that "should have been made," but was not, in blind-siding an issue we run the very real risk of substituting advocacy for neutrality.

State v. Zabawa (1996), 279 Mont. 307, 318, 928 P.2d 151, 158 (Nelson, J., specially concurring). In this case, the Court does precisely what Justice Nelson warned of in Zabawa. Apparently not pleased with the result a proper analysis of the issues raised by Mallak through his very experienced counsel require--affirmance of the District Court--the Court instead chooses to start from scratch in fashioning a "happy ending." While I agree that Mallak's situation is sad and unfortunate, I am not willing to travel the path the Court has taken. This is advocacy, pure and simple, and advocacy which, at the very least, risks violating the due process rights of the State of Montana (and the citizens it represents) in being heard on the matters at issue, as well as creating an unwise precedent for future cases.

¶33 I would affirm the District Court, and I dissent from the Court's refusal to do so.

/S/ KARLA M. GRAY
Justice Terry N. Trieweiler concurring.

¶34 Burhan Mallak was charged with the illegal sale of drugs to an undercover police officer in 1988. He pled guilty and was sentenced on September 28, 1989. He discharged his sentences on September 28, 1994.

¶35 It is undisputed by the State that at the time of his guilty pleas, Mallak was mentally retarded and had an English vocabulary equivalent to a four-year old. Furthermore, he was not advised that deportation was a consequence of his plea, no interpreter was present during the court's colloquy prior to the entry of his plea and he obtained nothing favorable from the State as consideration for his plea.

¶36 Mallak's impaired intellectual capacity is further evidenced by the fact that he has continued to receive mental health treatment from the time he entered his plea until his Petition for Postconviction Relief was filed.

¶37 In 1999 – five years after discharging his sentence – Mallak applied for citizenship. However, when the U.S. Immigration and Naturalization Service learned of his 1989 conviction, it began deportation proceedings. Mallak then applied for asylum and in support of his application, presented evidence that he would be executed for political reasons upon his return to his native Iraq and that he would have to leave his wife, four children, two brothers and mother, all of whom are now U.S. citizens.

¶38 Therefore, as this case is presented to us, a marginally retarded immigrant who speaks poor English, pled guilty to an offense for which he claims to have been entrapped without knowing that deportation and possibly execution was a consequence. Nevertheless, he has served his debt to our society by fully discharging his sentence. Now, upon learning of the full consequences to himself and his family, he seeks to set aside the guilty plea, which was entered unknowingly and without adequate information, at a point in time when there will be no practical consequences to the citizens of Montana because he has already served his sentences.

¶39 Mallak argued in the District Court that his petition should be treated as a motion to set aside his guilty plea and viewed as timely due to the fact that there is no specific time limit for such a motion. The State had notice of his claim and fully briefed that issue. The District Court addressed that claim on its merits and set forth in its order the legal rationale for its conclusion. However, the Chief Justice would have us ignore the merits of that claim, cause Mallak to abandon his wife and four children and face possible execution, because he made only passing reference to the claim in his brief on appeal. While she concedes that the alternative (abandonment of his family and possible execution) are "sad and unfortunate," she cannot condone such "unwise precedent for future cases."

¶40 I would submit that if any future case presents even remotely similar facts to those in this case, then the precedent established by this case is wise and should certainly be followed. I would also submit that when procedure blinds us to substance at the expense of families and human life, then we will not be worthy of the titles bestowed upon us by those same citizens for whom the Chief Justice expresses concern. Therefore, in spite of the Chief Justice's disappointment with this "happy ending," I gladly concur with the majority's opinion.

¶41 Furthermore, I would have reversed the District Court and arrived at the same result reached by the majority based on the "fundamental miscarriage of justice" exception to the statute of limitations which applies to petitions for post-conviction relief. Although I realize that exception has in the past been limited to subsequent proof of actual innocence, I believe the facts in this case also cry out for its application.

¶42 For these reasons, I concur completely in the majority opinion and concur with the result of the majority opinion on an additional and separate basis.

/S/ TERRY N. TRIEWEILER